UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANDREA MITCHELL WILKINSON,

                                    Plaintiff,

     -v-                                            1:15-cv-1395

JIMM LEWIS, Albany Police Officer, in his Official
and Individual Capacity; JOSEPH LYNCH, Albany
Police Officer, in his Official and Individual
Capacity; and ANTHONY GERACI, Lieutenant, in
his Official and Individual Capacity,

                                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

OFFICE OF LANNY E. WALTER                  LANNY E. WALTER, ESQ.
Attorney for Plaintiff
301 Van Vlierden Road
Saugerties, NY 12477

THE REHFUSS LAW FIRM, P.C.                 STEPHEN J. REHFUSS, ESQ.
Attorneys for Defendants                   ABIGAIL W. REHFUSS, ESQ.
40 British American Blvd.
Latham, NY 12110


DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

Plaintiff Andrea Mitchell Wilkinson ("plaintiff" or "Wilkinson") filed this civil rights action

seeking compensatory and punitive damages for injuries she sustained on November 25,

2012, when several police officers forcibly arrested her and later prosecuted her for three

charges stemming from the incident.  Plaintiff's operative complaint asserts claims against three Albany Police Department officers:  Police Officer Jimm Lewis ("PO Lewis"), Police Officer Joseph Lynch ("PO Lynch"), and Lieutenant Anthony Geraci ("Lt. Geraci") (collectively "defendants").  Plaintiff asserts § 1983 claims for false arrest, malicious prosecution, and excessive force against defendants in their official and individual capacities.

The parties have exchanged all necessary paper discovery and have conducted depositions of all necessary party and non-party witnesses.  In October 2017, defendants collectively moved for summary judgment under Federal Rule of Civil Procedure 56 to dismiss the second amended complaint in its entirety.  Plaintiff opposed the motion and defendants replied.  The motion was fully briefed and oral argument was heard on January 12, 2018, in Utica, New York.  Decision was reserved.

## II. **BACKGROUND**

Wilkinson is the owner and landlord of a four story commercial and residential building located in Albany, New York.  At the time of the events giving rise to this suit, the first floor of the building was occupied by a restaurant/bar plaintiff owned called Simply Fish & Jazz.  The remaining three floors housed four apartments; two on the second floor, one on the third floor, and one on the fourth floor.

On November 25, 2012, apartment #1 on the second floor was rented out to Deon Morrisey ("Morrisey") and Leon Dumas ("Dumas").  At that time, Dumas's son Justin Dumas ("Justin") and his wife Samantha Dumas ("Samantha") were separated and Justin was temporarily staying at his father's apartment.  Justin and Samantha had a two year old baby daughter at the time.

On the date in question, Justin had offered to watch the baby at a friend's house while Samantha went to visit her son at the hospital.  According to Samantha, Justin reassured her that he and their baby would be staying at the friend's house.  When Samantha dropped the child off to Justin at this location, she and Justin became involved in a dispute.  Samantha contends Justin pushed her to the ground and took the child.  She later received a phone call from Justin advising that he had taken the child to his father's apartment.  Justin asked Samantha to pick up their baby daughter at the apartment.  At Samantha's request, they agreed to meet at a neutral location, a nearby police station.  However, after Samantha's arrival, Justin changed his mind and refused to return their baby daughter to her.  When Justin left with the child, he did not have her required medication, and she had no shoes on her feet and no additional clothes.

Samantha was concerned for her baby daughter's safety because Justin did not have the required necessities and also because she knew alcohol and drugs were used at his father's apartment.  Seeking assistance, Samantha phoned Wilkinson, whom she knew as the owner and landlord of the building.  Samantha had phoned plaintiff several times during the week leading up to November 25, 2012 to complain about issues with Justin, specifically property Samantha claimed Justin had taken from her, brought to his father's apartment, and refused to give back including pets and at one point, their baby daughter.  On these prior occasions, plaintiff attempted to help by, for example, calling Dumas and asking him to encourage his son to give the pet back and advising of the building's no-pet policy.  Plaintiff never intervened physically or left her house during any prior attempts to help.

According to Wilkinson's phone records, it appears Samantha first phoned plaintiff on November 25, 2012 at 6:41 p.m.  <u>See</u> Walter Aff., Ex. 4 ("Phone records").  Plaintiff did not

- 3 -

answer and Samantha left a voicemail message.  Id., Ex. 3 (audio recording of message).
The message advised that Justin took their baby daughter to his father's apartment; that
Samantha needed her back, could not go to the apartment by herself due to prior incidents,
and that she did not want her baby daughter at the apartment due to the heavy alcohol
consumption which takes places there.  She requested plaintiff call her back.

Wilkinson's testimony regarding the following sequence of phone calls is slightly
unclear.  Her phone records appear to show that after Samantha's 6:41 p.m. call, plaintiff
called Dumas once, and his roommate Morrisey three times.  The phone records show
another call between plaintiff and Samantha at 6:47 p.m., lasting one minute.  There is
another call with Morrisey at 7:03 p.m., among calls to other numbers, before another one
minute call with Samantha at 7:13 p.m. and a four minute call with Samantha at 7:27 p.m.

When Wilkinson returned Samantha's initial phone call, she learned further details
about the situation.  According to plaintiff, Samantha was distraught; she was crying and
expressed concern that her baby daughter could be suffocated in the middle of the night if
Dumas and/or Justin rolled over on her.  She advised plaintiff that Justin was drunk and that
she would sue plaintiff if anything happened to her baby daughter.  Plaintiff knew from her
own prior interactions that father and son both drank heavily, and that roommate Morrisey
used marijuana.

Responding to Samantha's pleas and her own concern for the well being of a toddler
in the apartment building she owned, Wilkinson phoned Morrisey to request his assistance in
returning the child to her mother.  Again, plaintiff's phone records show a series of calls to
and from Morrisey between 6:43 p.m. and 7:03 p.m.  The parties dispute the content of those
calls and the bulk of what followed.

According to Wilkinson, she reached Morrisey while he was at work nearby.  She explained the situation and asked if Morrisey would meet her at the building and go with her into the apartment to try and persuade Justin to return the child to her mother.  Plaintiff insists Morrisey was willing to help and was also concerned about the child's well being.

Wilkinson phoned the police for the first time at 7:34 p.m. to advise of the situation and requested they respond to the building.  Samantha also called the police herself.  Plaintiff's phone records show over two dozen additional calls that night between 7:43 p.m. and 9:49 p.m.  Five of those calls were to the police, including one at 7:51 p.m., and four more between 9:24 p.m. and 9:49 p.m.  The phone records also show calls to and from Sam Williams ("Sam"), Morrisey's friend.  According to plaintiff, Morrisey's phone died at some point in the evening and she was communicating with both Morrisey and Sam on Sam's phone.

Wilkinson was the first to arrive to the building, some time between 9:00 and 10:00 p.m.[1]  She waited in her vehicle for approximately 30 minutes until Morrisey and his friend Sam arrived.  A surveillance video submitted by the parties shows two men on foot, presumably Morrisey and Sam, arriving and approaching plaintiff's vehicle.  See A. Rehfuss Aff., Ex. L.[2]  Morrisey then provided plaintiff access to the apartment and Morrisey, Sam, and plaintiff attempted to resolve the dispute.  Upon entering the apartment, they learned that Dumas, Justin, and the child were in Dumas's locked bedroom.  At some point while she was

---

[1]  The precise timeline is not clear.  According to plaintiff, she arrived shortly before 10 p.m.  The time stamp on the video surveillance shows her arriving closer to 9:15 p.m.  There has been mention that the time stamp on the video surveillance may not be accurate and thus plaintiff's undisputed timeline will be considered.

[2]  The video has no audio.

inside the apartment, plaintiff again phoned police and advised of the situation as it was unfolding.

Defendants' records indicate that around 9:20 p.m., the police received a call from Samantha, stating that the father of her child was intoxicated, that he had their child, and that she wanted the child returned to her.  Defendant PO Lewis was dispatched to the call.

Meanwhile, Wilkinson, Morrisey, and Sam tried to persuade Justin to exit the bedroom with the child but he refused; Justin and his father were screaming profanities and the child was crying.  Plaintiff, Morrisey, and Sam then began shaking the door and holding and pulling the door knob, trying to gain access.  Plaintiff asserts that the bedroom door was already in a fragile state; it was only partially hanging on the hinges, the hinges were weak and not secure, and the middle of the door was partially split when they arrived.  Father and son, on the other side of the door, were pushing and shoving the door.  With people on both sides of the door pushing and pulling, the door eventually gave way and swung open into the bedroom.  Plaintiff saw the child; she was crying and had no shoes or socks on, but appeared to be okay.  After seeing the child, she ultimately left the apartment and waited outside the building.  Morrisey and Sam appear to have remained inside the apartment.

In the mean time, Samantha arrived on the scene around 10:20 p.m. and waited outside.  When Wilkinson returned outside around 10:30 p.m., the two talked.  Thereafter, at approximately 10:45 p.m., two police officers arrived including PO Lewis, and began talking with Samantha outside.  Plaintiff remained outside, talking on her phone.  She eventually spoke with the officers.  Plaintiff advised PO Lewis what had transpired, including that she had seen marijuana and alcohol in the apartment and that Justin and his father were

intoxicated.  She told PO Lewis that the lock on the bedroom door had given way, and the child came out of the bedroom crying and went to plaintiff to be consoled.

A short time later, the two officers attempted to enter the building but could not pass the locked foyer.  At Wilkinson's request, Morrisey threw down the keys and she let the officers into the building.  A minute later, plaintiff and Samantha also entered the building and plaintiff reentered the apartment with the officers.  She and Samantha continued to plead for the child's return.  Samantha and one of the officers then exited the building shortly after 11:00 p.m. while plaintiff remained in the second floor hallway, at the top of the stairs.

At that time, defendant Lt. Geraci arrived on the scene, followed by two more uniformed officers, one of which was defendant PO Lynch.  At this point, there was one officer inside the building, and four officers outside.  Lt. Geraci, PO Lynch, and the other most recent officer to arrive entered the building.  According to Wilkinson, Lt. Geraci stomped up the stairs to the second floor where she was standing and yelled, "Look at all the trouble you're causing."  He continued to accuse her of causing trouble, including calling Child Protective Services.  He began questioning Justin, his father, Morrisey, and others on scene about how plaintiff gained access to the apartment, asking who let her in, did she use keys to get in, and so on.  Plaintiff contends that Justin and his father advised police that she let herself in, while Morrisey refuted this and said he was the one who let plaintiff in and told the officers to let the child go to her mother.

Lt. Geraci disputes yelling at plaintiff or accusing her of causing trouble.  It is undisputed that he questioned her as to her presence in the building and told her to go outside.  Plaintiff immediately complied.  Outside, she talked with PO Lynch for approximately 10 minutes.

Defendants were aware of Wilkinson and Samantha's concerns about the child. After interviewing Justin and confirming that no custody order existed, the officers inside decided the child was safe in Justin's care that evening. Eventually, Lt. Geraci and another officer exited the building. Lt. Geraci continued to accuse plaintiff of causing trouble and asked her who broke the bedroom door. She explained the pushing and pulling on the door that occurred. Lt. Geraci then told her that she would be arrested for "obstruction" of property. He advised PO Lynch to take plaintiff's belongings and that she was under arrest for trespassing.

Lt. Geraci, PO Lynch, and Police Officer Michael Commisso ("PO Commisso") then placed Wilkinson under arrest. In handcuffing her, Lt. Geraci grabbed and twisted her right arm. Defendants contend plaintiff was resisting; that she pulled her hand away from Lt. Geraci, was tensing up, making her arms rigid, screaming "no" repeated times, and attempting to pull away. According to defendants, it took three officers to place her under arrest; they had to put her against the building wall to prevent her from using her momentum to resist and to gain leverage to put her into custody. According to Lt. Geraci, he used a "soft-hand technique," grabbing her elbow and right wrist to try and place her hand behind her back to put handcuffs on.

During the arrest, Wilkinson alleges she was kicked in the back of the knee and pinned against the building as her arm was pulled upward. Further, her face, back, and body were pushed against the building and Lt. Geraci put a great deal of pressure on her arm. She insists that she did not resist the handcuffing but reacted to the grabbing and twisting of her arms and made no attempt to harm an officer, flee the scene, or resist. The arrest can be seen on the video footage. Plaintiff was then transported to the police station.

Wilkinson contends that while she was handcuffed on a bench in the police station, PO Lewis and another officer were directly across from her but behind a window. They were flipping through a little black book and saying to each other, "What about section code da, da, da" and would refer back to pages and were collaborating back and forth. Plaintiff later learned the book was the New York Penal Code.

Wilkinson was charged with trespassing, coercion, and resisting arrest. She spent the night in a cell and was arraigned the following morning. All charges were later dismissed in Albany City Court in her favor. Walter Aff., Ex. 6 ("City Court Decision").

She later sought medical attention and learned she had suffered a torn rotator cuff.

At some point during the evening of November 25, 2012, PO Lynch took a sworn, signed statement from Morrisey. See A. Rehfuss Aff., Ex. D ("Morrisey's statement"). According to Morrisey, Wilkinson "made reference to me that if I didn't cooperate with her, she would evict me"; he let her in because he didn't want any trouble; and that upon entering, she demanded to be let in to the bedroom, pulled on the door, and at some point the door broke. Id. Plaintiff disputes that she threatened Morrisey with eviction. Instead, she argues he was also concerned about the child's welfare given the alcohol consumption practices of the adults responsible for caring for her.

It is unclear when in the evening Morrisey provided the statement to PO Lynch. The time on the statement reads 10:15 p.m. There does not appear to be surveillance video of PO Lynch speaking with Morrisey before plaintiff's arrest, however, that may have taken place inside the building, away from the camera's view. Defendants assert that they learned Wilkinson forced her way into the bedroom by kicking down the door. Specifically, that she broke the door into two pieces and knocked it off the hinges.

## III.  LEGAL STANDARD

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Anderson, 477 U.S. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Accordingly, summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); see also Anderson, 477

U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## IV. DISCUSSION

### A. Threshold Matters

Before turning to the merits of the pending motion, there are two threshold issues that must be discussed.

### 1. The Video Evidence

"[T]he mere existence of a videotape in the record depicting some or all of the events in dispute will not always be dispositive at the summary judgment stage." Hulett v. City of Syracuse, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017). Instead, "the appropriate course of action is still to permit the jury an opportunity to resolve the competing versions of events, in conjunction with the video, through the ordinary fact-finding processes in which juries engage: evaluating credibility, drawing inferences from everything they have seen and heard, and deciding what all the evidence means and what it reveals about what happened." Id. (internal quotations omitted). The video evidence submitted by the parties will be considered and carefully reviewed, but interpretation of the events is most likely appropriately reserved for the triers of fact.

### 2. The Recent Morrisey Submission

Plaintiff seeks to refute Morrisey's November 25, 2012 sworn affidavit to PO Lynch by now submitting an unsworn and unnotarzied affidavit from Morrisey dated November 27, 2017, five years after the incident. See Walter Aff., Ex. 5. The affidavit will not be considered for largely those reasons stated in defendants' reply memorandum of law, namely that it is not in an admissible form for purposes of this motion.

**B.  <u>False Arrest</u>**

Wilkinson asserts a § 1983 claim against all defendants for false arrest.

Under New York law, a claim for false arrest requires the plaintiff to show that:  (1) the defendants intended to confine her, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.  <u>Ackerson v. City of White Plains</u>, 702 F.3d 15, 19 (2d Cir. 2012).  "To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity."  <u>Simpson v. City of N.Y.</u>, 793 F.3d 259, 265 (2d Cir. 2015).

"A police officer has probable cause to arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'"  <u>Jackson v. City of N.Y.</u>, 939 F. Supp. 2d 235, 249 (E.D.N.Y. 2013) (quoting <u>Weyant v. Okst</u>, 101 F.3d 845, 852 (2d Cir. 1996)).

"The test for probable cause is an objective one and 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'"  <u>Yorzinski v. City of N.Y.</u>, 175 F. Supp. 3d 69, 75 (S.D.N.Y. 2016) (quoting <u>Zellner v. Summerlin</u>, 494 F.3d 344, 369 (2d Cir. 2007)).  "An arresting officer thus does not have a 'duty . . . to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest."  <u>Id</u>. at 76 (quoting <u>Jocks v. Tavernier</u>, 316 F.3d 128, 135-36 (2d Cir. 2003)).  "At the same time, however, the Second Circuit has recognized that 'the failure to make a further inquiry when a

reasonable person would have done so may be evidence of lack of probable cause.'" Id. (quoting Manganiello v. City of N.Y., 612 F.3d 149, 161 (2d Cir. 2010)).

The parties dispute whether plaintiff can satisfy the fourth element, that is, whether her confinement was privileged by probable cause. Alternatively, defendants contend they are entitled to qualified immunity.

### 1. Trespass

Plaintiff argues defendants did not have probable cause to arrest her for trespass because she entered the apartment lawfully; she obtained Morrisey's consent and in the alternative, her entry was justified due to the emergency situation. Defendants contend probable cause existed for the crime of trespass because Wilkinson had no legal right to enter the apartment. They argue that as the owner and landlord, she was only permitted to enter if she provided advance notice, if the tenant consented, or if an emergency situation existed such as needing to prevent damage to the property. They contend that no emergency situation existed, Morrisey's consent was invalid because it was coerced, and no advance notice was provided.

"A person is guilty of criminal trespass . . . when . . . she knowingly enters or remains unlawfully in a dwelling." N.Y. Penal Law § 140.15(1) . Defendants have not established that on the undisputed material facts, they are entitled to judgment as a matter of law on this claim. To have probable cause, the officers must have had knowledge or reasonably trustworthy information to warrant the belief that Wilkinson knowingly entered or remained in the apartment unlawfully.

In the charging instrument, PO Lewis alleged that Wilkinson knew she did not have a lawful reason to enter the apartment. The arrest report reads: "[Wilkinson] did enter and

remain unlawfully inside the apartment specifically forcing her way into [Dumas's] bedroom where [Dumas and Justin] [sic] behind a closed bedroom door knowing that she did not have a lawful reason to be inside said apartment."  A. Rehfuss Aff., Ex. B ("Arrest Report").  In his deposition, PO Lewis testified that before he issued the charge, he talked to plaintiff about her reason for entering the apartment.

PO Lewis also filed a report containing information directly from Samantha.  A. Rehfuss Aff., Ex. A, 96-2 ("Domestic Incident Report").  The time on the report is 9:20 p.m. In his portion of the Domestic Incident Report, PO Lewis writes that Samantha informed him that both Justin and his father consume large amounts of alcohol and are intoxicated.  Id.  In her statement, Samantha writes that Justin took their baby daughter from her after pushing her (Samantha) to the ground and that Justin has recently been drinking excessively.  Id.

PO Lewis thus knew about Wilkinson's concern, as well as Samantha's, for the child's well being, yet testified that these facts did not constitute an emergency permitting plaintiff to enter.  Instead, he testified that an emergency in the context of landlord/tenant law means flooding or a fire that would damage the property.  He testified that as far as a child being in a dangerous situation, it is a citizen's duty to advise law enforcement and let them handle it.  In other words, PO Lewis maintains that he *knew* Wilkinson called the police but that she was required to wait outside the building for however long it took the police to arrive and risk that a two year old child might be harmed or die.  In fact, she made six calls to the police between 7:34 p.m. and 9:49 p.m., the officers did not arrive at the scene until approximately 10:45 p.m.  Samantha also made a number of calls to the police.

In his deposition, PO Lynch agreed that an emergency situation would justify a landlord's entrance, but that these facts did not constitute such an emergency.  In his

deposition, Lt. Geraci summarily concluded that he knew probable cause existed to believe Wilkinson committed the crime of trespass because this was not one of the few circumstances in which a landlord would be authorized to enter absent notice or consent.  He also testified that he was not aware Samantha had asked plaintiff for help in removing her daughter from the apartment.

A trier of fact could find unreasonable the officers' belief that this was not an emergency permitting the landlord's entrance.  Though a bursting pipe or fire are typical examples of situations permitting exigent entrance under landlord/tenant law, landlords have a right to address an emergency situation that the landlord reasonably fears places a tenant, a visitor, or other tenants in jeopardy.  See Decrescente v. Catholic Charities of Albany, 932 N.Y.2d 575, 577 (N.Y. App. Div. 3d Dep't 2011) ("[L]andlords have a duty to exercise reasonable care and take minimal security precautions to protect guests and tenants from reasonably foreseeable harm, including foreseeable criminal acts of third parties on the premises."); see also Mills v. Gardner, 106 A.D.3d 885, 886 (N.Y. App. Div. 2d Dep't 2013) (noting that when a landlord has the authority, ability, and opportunity to control an assailant, she has a duty to act); Brathwaite v. NYC Hous. Auth., 92 A.D.3d 821, 823 (N.Y. App. Div. 2d Dep't 2012) ("Landlords have a common-law duty to take minimal precautions to protect tenants from the reasonably foreseeable criminal conduct of third parties.").

Defendants knew Wilkinson was the owner and landlord of the building.  They knew that Morrisey, a tenant, consented to let her into his apartment.  Even if she "coerced" him, they should have known that this was clearly not a crime when she, as a landlord, was faced with an emergency situation involving a two year old baby in her building.  They knew of plaintiff and Samantha's concerns; that a two year old child was staying at the apartment,

that alcohol consumption and drug use was common on the premises, that the child's father was possibly intoxicated, and that the women believed the child was lacking basic necessities including clothing, shoes, and medication.  They knew that plaintiff was there to attempt to fix a problem, not cause a problem.

Alternatively, a trier of fact could also find unreasonable the officers' belief that Wilkinson did not obtain Morrisey's consent to enter the apartment, which is discussed more fully below.

Defendants also knew that plaintiff left the building immediately upon being told to do so, and thus they could not have reasonably believed that she remained unlawfully in the apartment.  As Albany City Court Judge William A. Carter noted in dismissing the trespass charge, "no facts have been pleaded from which this Court can reasonably infer that [Wilkinson] knowingly remained unlawfully in the dwelling."  City Court Decision, 4.  The facts alleged in the information, which Judge Carter found facially insufficient, are the same facts asserted in Morrisey's statement, which formed the factual predicate for the trespass charge.

Considering the information known to the officers at the time, it cannot be said that a rational trier of fact could not find for plaintiff on her version of the facts.  Judgment as a matter of law is inappropriate.

### 2. Coercion

Plaintiff argues that defendants did not have probable cause to arrest her for coercion because she never threatened Morrisey with eviction.  Instead, he willingly met her at the apartment to grant her access because he too was concerned for the child's safety. Defendants contend probable cause existed for the crime of coercion because they learned

from Morrisey that plaintiff threatened him with eviction if he did not provide her entry and that faced with eviction, he had no choice but to provide her entry.

"A person is guilty of coercion . . . when . . . she compels or induces a person to engage in conduct which the latter has a legal right to abstain from engaging in . . . by means of instilling in him . . . a fear that, if the demand is not complied with, the actor or another will . . . [p]erform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his . . . health, safety, business, calling, career, financial condition, reputation or personal relationships."  N.Y. Penal Law § 135.60(9).

Defendants have not established on the undisputed material facts that they are entitled to judgment as a matter of law.  To have probable cause, the officers must have had knowledge or reasonably trustworthy information to warrant the belief that Wilkinson compelled Morrisey to consent to allowing her to enter the apartment, when he had a legal right to abstain from providing that consent, by means of threatening to evict him by the month's end.

Disputed material facts preclude a determination of whether defendants could have reasonably believed that plaintiff induced or compelled Morrisey at all or whether Morrisey in fact had the legal right to abstain from allowing his landlord into his apartment under these emergency circumstances.  The only allegation that plaintiff compelled or induced Morrisey to engage in conduct whatsoever is the portion of Morrisey's statement which states "she [plaintiff] made reference to me that if I didn't cooperate with her, she would evict me."

PO Lewis, who filed the criminal charge, did not hear whatever it was plaintiff said to Morrisey when she asked him to allow her to enter the apartment.  PO Lewis was not present

during the series of phone calls between plaintiff and Morrisey, nor when plaintiff and

Morrisey spoke upon his arrival at the building.  The arrest report reads:  Wilkinson "did

intentionally compel [Morrisey] to allow her access to 147 S. Pearl St., Apt #1 by stating that

if [Morrisey] did not cooperate, he would be evicted by the end of the month.  Said actions by

[Wilkinson] did instill fear in [Morrisey] that if the demand was not met he would be harmed

by his health and safety of being evicted and homeless."  Arrest Report.

As Albany City Court Judge Carter explained in dismissing the coercion charge, "[N]o

facts have been pleaded to support even the inference that [Wilkinson] compel[ed] or

induced [Morrisey] to engage in conduct which [Morrisey] has a legal right to abstain from

engaging in."  Albany City Court Decision, 3.  Again, the facts alleged in the information,

which Judge Carter found facially insufficient, are the same facts asserted in Morrisey's

statement, which formed the factual predicate for the coercion charge.

By contrast, at the scene plaintiff not only denied to officers that she threatened

Morrisey with eviction, but insisted Morrisey was helpful and far from coerced, evidenced by

his behavior at the scene and his assistance in throwing down the keys.  These allegations

give rise to a factual dispute over whether Morrisey was present to help or was coerced, and

thus whether defendants reasonably believed that plaintiff committed the crime of coercion.

Moreover, factual disputes remain regarding whether Morrisey had a legal right to abstain

from providing Wilkinson access under these emergency circumstances regardless of

whether or not she threatened him with eviction.  Those issues are for a jury to determine.

### 3.  Resisting Arrest

Wilkinson argues that defendants did not have probable cause to arrest her for

resisting arrest because she was not intentionally preventing her arrest or attempting to

prevent her arrest. Instead, she was merely reacting to her arm being pulled and twisted. Defendants contend probable cause existed for the crime of resisting arrest because as soon as they informed Wilkinson she was under arrest and instructed her to place her hands behind her back, she began to actively resist including screaming, tensing up, and attempting to pull her arms away from officers.

"A person is guilty of resisting arrest when [s]he intentionally prevents or attempts to prevent a police officer . . . from effecting an authorized arrest of [her]self . . . ." N.Y. Penal Law § 205.30. To have probable cause, the officers must have had knowledge or reasonably trustworthy information to warrant the belief that Wilkinson intentionally prevented her arrest or attempted to prevent her arrest.

First, there are disputed issues of fact as to whether Wilkinson actually attempted to or did resist arrest. In the Arrest Report, PO Lewis charged that plaintiff "did, after she was informed she was under arrest, resist her lawful arrest for PL 140.15 (criminal trespass) and PL 135.60-9 (coercion 2nd) by physically tensing up her arms and stating no, no, no! [Wilkinson] continued to resist after several requests to put her hands behind her back." After reviewing the surveillance video several times, it simply cannot be said, as a matter of law, that no reasonable fact finder could draw the set of conclusions necessary to find in plaintiff's favor. It is up to the triers of fact to make some specific findings before a determination can be made that plaintiff intentionally prevented or attempted to prevent the officers from arresting her.

Moreover, factual disputes preclude a determination that her arrest was in fact even authorized in the first instance. As Albany City Court Judge Carter found, "[a] key element of resisting arrest is the requirement that there be an authorized arrest. Thus, the arrest in

issue must have been made in accordance with law, including a finding that the arrest was premised on probable cause." City Court Decision, 4 (internal quotations omitted). If there was no probable cause to arrest Wilkinson for trespass or coercion, then her arrest was not authorized, and she could not be guilty of resisting arrest. Disputed issues of material fact preclude a finding on this claim as a matter of law.

For the above reasons, it cannot be said that there can be but one reasonable conclusion as to the verdict on plaintiff's false arrest claims and summary judgment will be denied.

## C. Malicious Prosecution

Wilkinson asserts a § 1983 claim against all defendants for malicious prosecution.

To prevail on a claim of malicious prosecution, a plaintiff must establish: (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice. Savino v. City of N.Y., 331 F.3d 63, 72 (2d Cir. 2003). In addition, a § 1983 malicious prosecution claim requires that "there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." Washington v. Cnty. of Rockland, 373 F.3d 310, 316 (2d Cir. 2004).

The parties dispute whether Wilkinson can satisfy the third and fourth elements. Alternatively, defendants contend they are entitled to qualified immunity. Defendants reiterate their arguments as to why probable cause existed and contend there is absolutely no evidence that the prosecution was initiated with malice.

A reasonable jury could find the "lack of probable cause" element to be satisfied. "Probable cause in the context of a malicious prosecution claim requires knowledge of facts,

actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." Penree v. City of Utica, 2016 WL 915252, at *29 (N.D.N.Y. Mar. 4, 2016) (D'Agostino, J.).  Because defendants simply refer to their earlier probable cause arguments, they are rejected at this juncture for the same reasons already discussed.

Finally, a jury could also find the "malice" element has been satisfied.  "In this context, malice does not require actual spite or hatred, but rather means only that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." Hulett, 253 F. Supp. 3d at 497 (internal quotations omitted).  Significantly, malice may be inferred from a lack of probable cause.  Also, the interactions between plaintiff and the defendants, particularly Lt. Geraci, the physical nature of the arrest, and the overheard conversation at the police station are all factors to be considered in a jury determining the malice issue.  Thus, factual disputes preclude a summary determination on the issue of malice as well. Id. (collecting cases).

A review of the record reveals sufficient evidence for a rational trier of fact to find in plaintiff's favor on her malicious prosecution claim and summary judgment will be denied.

### D. Excessive Force

Wilkinson asserts a § 1983 claim against PO Lynch and Lt. Geraci for excessive force. At oral argument, she withdrew the claim against PO Lewis as he was not involved in the physical arrest.

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010).  To succeed on an excessive force claim, "a plaintiff must ultimately

demonstrate that the defendant's use of force was objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Hulett, 253 F. Supp. 3d at 491 (internal quotations omitted); Maxwell v. City of N.Y., 380 F.3d 106, 108 (2d Cir. 2004).  The "objective reasonableness" inquiry is "case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." Tracy, 623 F.3d at 96 (citing Amnesty America v. Town of West Hartford, 361 F.3d 113, 123 (2d Cir. 2004)).

In evaluating an excessive force claim, a court should consider:  "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Id. (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).  "[A] court must evaluate the record from the perspective of a reasonable officer on scene, rather than with the 20/20 vision of hindsight." Hulett, 253 F. Supp. 3d at 491 (internal quotations omitted) (citing Tracey, 623 F.3d at 96; Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006)).  "In so doing, it is important to make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Hulett, 253 F. Supp. 3d at 491-92 (internal quotations omitted)

"Accordingly, police receive a fairly wide zone of protection in close cases involving potential danger, emergency conditions, and other exigent circumstances." Lin v. Cnty. of Monroe, 66 F. Supp. 3d 341, 358 (W.D.N.Y. 2014) (citation omitted).  However, "granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless

no reasonable fact finder could conclude that the officers' conduct was objectively unreasonable." Amnesty Am., 361 F.3d at 123.

First, defendants contend PO Lynch did not assist in plaintiff's physical arrest. This is refuted by the surveillance video and was disputed at oral argument. As to Lt. Geraci's involvement, defendants argue his actions were reasonable and appropriate given Wilkinson's active resistance.

Defendants, as most do, attempt to paint the picture as a chaotic scene and a rapidly evolving situation that required quick action to ensure officer safety. They contend that as soon as they advised Wilkinson she was under arrest and instructed her to place her hands behind her back, she began to actively resist, making an unsafe situation which required the assistance of three officers to handcuff this 52 year old woman who stood at 5 feet, 5 inches tall and weighed approximately 160 pounds. The surveillance video as well as PO Lynch's own testimony tends to undermine that characterization of the circumstances. See Greenaway v. Cnty. of Nassau, 97 F. Supp. 3d 225, 235 (E.D.N.Y. 2015) ("Because objective reasonableness is extremely fact-specific, summary judgment on the issue is often inappropriate.").

Among other things, at the time of the incident, Wilkinson was merely standing outside the building, speaking to an officer, after recently complying with Lt. Geraci's demand that she exit the building—meaning she was not, for example, in the commission of a crime or in a situation posing a danger to herself or others, situations that might militate in favor of the conclusion that the situation needed to be resolved quickly for safety purposes.

Wilkinson refutes that she resisted the arrest, attempted to flee, or posed any safety threat to the officers. She insists that no force was necessary whatsoever, let alone pressure

strong enough to tear her rotator cuff.  In considering the objective reasonableness of the force used, neither the crime of trespass nor coercion can fairly be described as serious under *these* circumstances.  While admittedly both Class A misdemeanors, the basis for these crimes was plaintiff's call to police and attempt to help resolve the status of a toddler on the premises she owned, whose mother wanted her baby daughter returned to her, and whose well being was also of concern to plaintiff as the owner of the building.

Once officers arrived, Wilkinson complied with their directive that she leave the building, and she did nothing to challenge the officers' decision to leave the child with Justin. There is no evidence that she attempted to flee.  In fact, in his deposition, PO Lynch testified that plaintiff did not present a danger to him and that he did not believe she was armed.  He could not recall whether she attempted to flee.

In addition, the surveillance video fails to clearly show what occurred as Lt. Geraci, PO Lynch, and the other arresting officer, PO Commisso, forcefully arrested Wilkinson and led her into the inside hallway of the building.  It leaves the viewer wondering whether, and to what extent, additional force may have been applied during those moments that might have contributed to plaintiff's torn rotator cuff.

It cannot be said as a matter of law that Lt. Geraci or PO Lynch acted in an objectively reasonable manner by forcefully pulling plaintiff's arms to handcuff her, since she did not appear to be offering any resistance.  As to whether she posed an immediate threat to officer safety or was actively resisting, a jury must make those determinations.

It cannot be said that a jury could not find for plaintiff on her excessive force claim and resulting injury.  Therefore summary judgment on this claim will be denied.

### E.  Qualified Immunity

Defendants "are entitled to qualified immunity if they can establish either that (1) a constitutional right was not violated or (2) the right was not clearly established."  Royal Crown Day Care LLC v. Dep't of Health and Mental Hygiene of City of N.Y., 746 F.3d 538, 543 (2d Cir. 2014) (internal quotations omitted).

The above noted issues of fact, particularly with respect to whether defendants possessed probable cause to believe Wilkinson committed the crimes of trespass, coercion, and resisting arrest, preclude a determination of whether defendants' actions in arresting and prosecuting plaintiff are protected by qualified immunity as a matter of law.[3]

Though unclear whether defendants seek qualified immunity with respect to the excessive force claim, "[s]ince the law in this area is well-established, in Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits."  Washpon v. Parr, 561 F. Supp. 2d 394, 408 (S.D.N.Y. 2008) (internal quotations omitted).  Accordingly, qualified immunity on plaintiff's excessive force claim is clearly inappropriate.

## V.  CONCLUSION

The appropriate way to resolve Wilkinson's claims is by proceeding to a trial on the merits.  Defendants have failed to establish that they are entitled to judgment as a matter of law dismissing plaintiff's false arrest, malicious prosecution, or excessive force claims and therefore summary judgment will be denied.  Finally, the grant of qualified immunity is inappropriate at this juncture.

---

[3]  The decision of Albany City Court Judge Carter is very instructive in this regard.  He dismissed all criminal charges; trespass, coercion, and resisting arrest against her because, even assuming the facts as alleged by the defendants, there was absolutely no crime committed by plaintiff.  See City Court Decision.

Therefore, it is

ORDERED that

1.  Defendants' Jimm Lewis, Joseph Lynch, and Anthony Geraci's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 dismissing the second amended complaint in its entirety is DENIED; and

2.  The § 1983 excessive force claim against defendant Jimm Lewis is withdrawn and DISMISSED.

IT IS SO ORDERED.

_____
United States District Judge

Dated: February 5, 2018
       Utica, New York.